782 So.2d 1194 (2001)
STATE of Louisiana
v.
Chad Louis BOUDREAUX.
No. 00-1467.
Court of Appeal of Louisiana, Third Circuit.
April 4, 2001.
*1195 Michael Harson, District Attorney, Lafayette, LA, Counsel for Plaintiff/Appellee, State of Louisiana.
Lawrence Charles Billeaud, Lafayette, LA, Counsel for Defendant/Appellant, Chad Louis Boudreaux.
Court composed of YELVERTON, PETERS, and GREMILLION, Judges.
GREMILLION, Judge.
In this case, the defendant, Chad Boudreaux, appeals his three separate convictions and sentences. He was convicted on two counts of aggravated burglary, a violation of La.R.S. 14:60, and sentenced to thirty years imprisonment at hard labor on each count; one count of armed robbery, a violation of La.R.S. 14:64, and sentenced to ninety-nine years at hard labor, without benefit of parole, probation, or suspension of imposition or execution of sentence; and one count of first degree robbery, a violation of La.R.S. 14:64.1, and sentenced to forty years imprisonment at hard labor, without benefit of parole, probation, or *1196 suspension of imposition or execution of sentence. All three sentences were ordered to run consecutively. For the following reasons, we affirm.

FACTS
Three separate incidents gave rise to Defendant's charges. The first occurred on March 27, 1997, and resulted in a charge of aggravated burglary. According to the record, Herman Kesel and his wife had returned to their Lafayette, Louisiana home shortly after 8:00 p.m., when he heard a loud rapping at his carport door. Kesel testified that he went to the door and spoke to Defendant for several minutes, first through a glass door and a screen door, and then only through a screen door. Kesel stated that he was three and one-half to four feet away from Defendant and could see him clearly because of a light shining directly on his face. Kesel claimed that Defendant showed him a police badge and claimed to be a detective looking for Kesel's daughter. Kesel testified that he smelled alcohol on Defendant and refused to let him enter their home. Kesel further testified that he opened the screen door once he thought Defendant had left. However, he stated that Defendant grabbed him, entered his home, and beat him, bloodying his face and bruising his arms and body. Defendant knocked Kesel to the floor, placed a handcuff on his right wrist, and held him down. At that point, Kesel testified that Defendant "had his shirt out of his pants and he reached under his shirt with his arm and his hand and said, `give me your money or I will kill both of you.'" Defendant left after the Kesels complied. Several days later, Kesel positively selected Defendant from a photographic lineup shown to him by the police. At trial, he positively identified Defendant as the man who beat and robbed him.
Kesel's wife confirmed much of her husband's testimony. Although she did not get as good a look at Defendant as her husband did, she picked Defendant and one other person out of a photographic lineup as the person most resembling the intruder.
Cherie Arceneaux Fournet, Defendant's girlfriend, testified that she was in his vehicle when he went to the Kesel residence. According to Fournet, the badge and the handcuffs used in the crime belonged to Defendant's deceased father, a former sheriffs deputy. She said that Defendant took those items from his mother's home before going to the Kesel residence.
The second incident occurred around 7:00 p.m. on April 2, 1997, and led to charges of aggravated burglary and armed robbery. Two teenagers, S.G. and P.G.,[1] fifteen and thirteen years old respectively, testified that they were taking care of their grandmother, Nettie Thompson, at her Lafayette, Louisiana home, where she was recovering from recent surgery.[2] The children testified that Defendant knocked on the door and claimed to be a bounty hunter looking for their mother. They said that P.G. spoke to Defendant for at least five minutes before he forced his way into the residence, pulled a knife from underneath his shirt, ordered them to get down on the floor, pointed the knife at their grandmother, and demanded money from her. They testified that Defendant took money from their grandmother's purse and then left.
The trial testimony reflected that S.G. and P.G. identified a shirt and knife, brought by police to the Thompson home *1197 later that evening, as the shirt worn by Defendant and the knife carried by him. They both positively selected Defendant in a photographic lineup that evening and identified him at trial as the man who entered their grandmother's home and robbed them. P.G. also testified that he saw Defendant's vehicle, an older model pickup truck, parked outside their grandmother's house with a female sitting in it, while Defendant was inside the residence.
Police Officer James Granger testified that he investigated the incident at the Thompson home on April 2, 1997. He stated that he broadcasted a bulletin giving a description of the suspect shortly after 7:00 p.m. Not long after that, he testified that he went to a location where police had detained Defendant. Officer Granger stated that he found a blue shirt in Defendant's vehicle and located a knife in a gas station trash can pursuant to information given him by Fournet, who was in Defendant's vehicle when it was stopped.
Fournet testified that she had previously cared for Thompson's grandchildren and she knew their mother. She stated that she told Defendant that the children's grandmother was fairly wealthy, and that she was in Defendant's truck when he entered the grandmother's residence on the evening of April 2, 1997.
The third incident, which led to the charge of first degree robbery, occurred at Richard Hughes' home shortly before 8:00 p.m. on April 2, 1997. Hughes testified that he was in the driveway of his Lafayette, Louisiana home, when he saw a pickup truck pass his house, stop, and back toward his driveway. Hughes testified that Defendant exited the truck and approached him, asking for directions. Hughes said that he clearly saw Defendant as they spoke and that Defendant eventually demanded his wallet and threatened to shoot him with a gun, which Hughes believed was under Defendant's shirt. Hughes positively picked Defendant from a photographic lineup which Officer Michael Onezine showed him that evening, and identified Defendant at trial as the man who took his wallet.
Hughes and Fournet testified that Fournet returned Hughes' wallet to him the day following the incident. Fournet also testified that she was in Defendant's truck when he approached Hughes, and that she retrieved Hughes' wallet from where Defendant had later thrown it.

ERRORS PATENT
In accordance with La.Code Crim.P. art. 920, we review all appeals for errors patent on the face of the record. After reviewing the record, we find that there are two errors patent. First, the minutes of sentencing reflect that the trial court ordered Defendant to serve ninety-nine years at hard labor for his armed robbery conviction. However, the transcript of sentencing indicates that the trial court ordered that the sentence be served without benefit of parole, probation, or suspension of sentence. Accordingly, the case is remanded and the trial court is ordered to correct the minutes and the commitment order to reflect the sentence set forth in the transcript.
Second, Defendant was not informed of the two-year time limit for filing postconviction relief as required by La.Code Crim.P. art. 930.8. Thus, upon remand, the trial court is directed to inform Defendant of the provisions of Article 930.8 by sending appropriate written notice to him within ten days of the rendition of this opinion and to file written proof that he received the notice in the record of the proceedings. See State v. Fontenot, 616 So.2d 1353 (La.App. 3 Cir.), writ denied, 623 So.2d 1334 (La.1993).

*1198 COMMENTS BY THE TRIAL COURT
In this assignment of error, Defendant argues that the trial court erred by repeatedly interrupting defense counsel and making objections not made by the State. Defendant claims that the trial court's actions are prohibited by La.Code Crim.P. art. 772, which requires the trial court to refrain from making certain comments in front of the jury. The specific incidents which Defendant complains of are summarized as follows:
1. The trial judge interrupted a witness to question the relevancy of Defendant's question about the witness/police officer's training in submitting photographs for photographic lineups. The trial judge then pointed out that the witness had not prepared the photographic lineup in question; he had only shown the lineup to the victims.
2. The trial judge remarked that the defense attorney's cross-examination question to a witness/police officer was argumentative in the following exchange:
[WITNESS]: His remarks [were] "I realized that it was him because he has the tatoo (sic) and everything that I mentioned. When he opened it I just knew it was him. He is everything that I saw. I'm also positively sure that it was number two (2)."
[DEFENSE ATTORNEY]: The only physical characteristic that Preston Granger indicates is the tatoo, (sic) correct?
BY THE COURT:
That's argumentative.
3. The trial judge questioned the relevancy of Defendant's question to a witness (Fournet) about the length of sentence she received for an offense unrelated to the offenses at trial. Although the trial judge did not allow the question about the sentence she received, he allowed Defendant to ask Fournet how long she was imprisoned for the unrelated offense.
4. The trial judge remarked to the defense attorney that his question to Fournet about her previous untruthfulness was argumentative.
5. The trial judge declared that the defense attorney's further questioning of Fournet about an affidavit she signed and was claiming at trial contained lies, was argumentative and "asked and answered."
6. The trial judge questioned the relevancy of Defendant's question to Fournet regarding whether she had rented a vehicle in exchange for crack cocaine.
Initially, we note that Defendant did not object at trial to any of the comments made by the trial court. If a defendant does not object to comments made by the trial court at the time they were made, he waives the right to raise the issue on appeal. State v. Howard, 93-74 (La.App. 3 Cir. 11/2/94); 649 So.2d 489, writ denied, 94-2944 (La.3/17/95); 651 So.2d 266. Nevertheless, had Defendant objected to the comments, his objections would have been meritless.
A trial court's remarks are limited by Article 772, which provides:
The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted.
The only case relied upon by Defendant in support of his argument that the trial court violated Article 772 and, therefore, committed error is State v. Colligan, 95-880 *1199 (La.App. 3 Cir. 8/7/96); 679 So.2d 184. In Colligan, which is clearly distinguishable from the instant case, we concluded that the trial court had commented on the evidence and violated Article 772 by reading the bill of information to the jury in its charges without identifying it as the bill of information. Certainly, in Colligan, the trial court's action amounted to a prohibited comment on the evidence "to the maximum extent imaginable." Id. at 190. However, in the instant case, the remarks at issue are neither inflammatory nor prejudicial, and Defendant does not claim otherwise.
The comments by the trial court in this case are similar to the comments at issue in State v. Felde, 422 So.2d 370 (La.1982), cert. denied sub nom, 461 U.S. 918, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983). In Felde, the supreme court found that the trial court's few remarks attempting to limit irrelevant and unnecessary examination of various witnesses did "not establish that any impression of the accused's guilt or innocence was conveyed to the jury." Id. at 387.
Likewise, in the instant case, while some of the trial court's comments/objections were arguably incorrect or improper, its remarks did not constitute comments on or a recapitulation of the evidence, did not repeat the testimony of any witness, or give an opinion of what had been proved, not proved, or refuted. Moreover, the trial judge's objections in this case were aimed at having the trial proceed in an orderly manner with relevant evidence and did not focus on Defendant's guilt or innocence on the crimes charged.
Accordingly, we find that this assignment of error is without merit.

SUBPOENA FOR ELECTRONIC MONITORING RECORDS
By this assignment of error, Defendant argues that the trial court erred by not requiring his probation officer to bring records of his electronic monitoring to trial. Defendant, who wore an ankle monitor during the time of the incidents described above, claims that the trial court refused to enforce a subpoena for these records, and that the records would have established that he was at home during the commission of the charged offenses.
The record indicates that the discussion regarding these records did not transpire as Defendant describes. Although the trial court stated that an instanter subpoena was to be issued for Defendant's probation officer, Robert Baudoin, there is nothing in the record indicating that Baudoin was required to produce Defendant's electronic monitoring records. Indeed, the record indicates that the records were never subpoenaed. Not only does the record indicate that it was unlikely Baudoin was ever served with a subpoena requiring him to bring the electronic monitoring records to trial, there is nothing in the record to show that he refused to produce these records. Indeed, after Baudoin testified that he could obtain the electronic monitoring records within an hour with a court order, there is nothing in the record indicating that Defendant requested the production of these records or a denial of such request by the trial court.
The record also indicates that it is unlikely that the electronic monitoring records would support Defendant's claims. Baudoin testified that he reviewed Defendant's electronic monitoring records and they reported numerous curfew violations, almost on a daily basis. He also testified that he recalled a curfew violation recorded on March 27, 1997, and a curfew violation with a "did not return" note on April 2, 1997, the night of Defendant's arrest.
The only indication given by Baudoin about what the records contained was information *1200 that an alarm would go off if Defendant failed to return home for his 9:00 p.m. curfew. Baudoin did not testify that the records, as Defendant claims, would indicate his whereabouts during non-curfew hours, such that they could prove he was home when the charged offenses occurred. Moreover, because the testimony at trial clearly showed that the March 27, 1997 incident at the Kesels' residence occurred well before 9:00 p.m., it is irrelevant whether Defendant violated his curfew on that night. Likewise, on April 2, 1997, Defendant's arrest precipitated his curfew violation that evening.
Defendant has failed to articulate a specific error by the trial court which may be identified in the record. Accordingly, this assignment of error has no merit.

EXCESSIVE SENTENCE
In this assignment of error, Defendant argues that the sentences imposed on him are unconstitutionally excessive. He specifically complains that the facts involved in the offenses do not merit the imposition of the maximum sentences he received. He also claims that the sentences should have been imposed concurrently, instead of consecutively.
In sentencing Defendant to the maximum allowable sentence on each conviction and ordering the sentences to be served consecutively for a total of 199 years imprisonment at hard labor, the trial court stated:
[T]he Court has reviewed the provisions of Article 894.1 of the Code of Criminal Procedure concerning the sentencing guidelines and the provisions under that article. And so those provisions are given consideration in the sentence as it is to be pronounced by this Court.
... [T]his Court heard the evidence in this case and finds that it was very compelling in establishing the facts that gave rise to your conviction, Mr. Boudreaux. The Court notes your defense of mistaken identity; however, I am convinced that no such mistake occurred. There is absolutely no question that it was you ... who committed these crimes.
The victims in all three (3) incidents, positively identified you as the perpetrator as did additional eye witnesses.
. . . .
Your commission of these crimes is particularly reprehensible because you chose the elderly of our community to victimize. As defenseless as they were, you ... put these elderly victims in the position of fear and terror. They literally had to pled (sic) for their lives. Your flashing a police badge bought you into the residence of the victims, brandishing a gun, handcuffing, pistol whipping and robbing your victims is one of the most egregious offense one can commit. This Court does not relish handing out long prison sentences because we understand that man is not perfect and we recognize the fallibility which is inherent in human nature.
Therefore, this Court strongly believes in allowing deserving persons an opportunity to be removed for (sic) society on a temporary basis, be rehabilitated or reformed with a chance to rejoin society at sometime in the future. But there are exception[s]. Just as there are those who deserve a chance to rejoin society at some point, there are other[s] who do not. I believe your case fits the exception.
The trial court then recognized that Defendant had amassed a criminal record spanning a period of more than twenty years. The trial court detailed Defendant's criminal history, which included eleven dismissed charges, seventeen *1201 charges which were either not accepted or refused, and three charges which had an unknown, a pending, or no disposition. Defendant's previous convictions included: forgery (three counts) in February 1981, simple burglary in August 1981, simple burglary (two counts) in September 1981, simple burglary in March 1984, and forgery (three counts) in January 1990. After Defendant committed the charged offenses in March and April of 1997, he served several days in prison for vehicular violations and was charged with possession of marijuana, for which a disposition was still pending.
After reviewing Defendant's extensive criminal history, the trial court stated:
I realize that your criminal history reveals many arrests and/or charges that were not prosecuted, but were dismissed or refused for whatever reason, and as such are not convictions. However, these dismissals and refusals of numerous arrests and charges bespeaks the fact that someone sought to give you the benefit of the doubt. In other words, you [were] given every opportunity after opportunity to reform and/or change your ways. Apparently, this leniency was all to no avail. You made the conscientious decisions to persist in committing serious acts of criminal conduct, despite the consideration shown you through the years.
The only antidote that I know of in dealing with someone as predisposed as you are is to permanently remove that individual from society.
The trial court has wide discretion in imposing a sentence, and a sentence imposed within the statutory limits will not be deemed constitutionally excessive absent a manifest abuse of discretion. State v. Evans, 97-504 (La.App. 3 Cir. 10/29/97); 702 So.2d 1148, writ denied, 97-2979 (La.4/3/98); 717 So.2d 231. This court, in State v. Dubroc, 99-730, p. 22 (La.App. 3 Cir. 12/15/99); 755 So.2d 297, 311, noted:
The relevant question on review of a sentence is whether the trial court abused its broad sentencing discretion and not whether the sentence imposed may appear harsh or whether another sentence might be more appropriate. State v. Cook, 95-2784 (La.5/31/96); 674 So.2d 957, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). To constitute an excessive sentence, this court must find the penalty imposed is so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals; and, therefore, it is nothing more than needless imposition of pain and suffering. State v. Campbell, 404 So.2d 1205 (La.1981). The trial court is given wide discretion in imposing a sentence, and a sentence imposed within statutory limits will not be deemed excessive in the absence of manifest abuse of discretion. State v. Pyke, 95-919 (La. App. 3 Cir. 3/6/96); 670 So.2d 713.
In State v. Holmes, 99-0631, p. 4 (La. App. 1 Cir. 2/18/00); 754 So.2d 1132, 1134-35, the court stated:
The trial court should give weight to the sentencing guidelines and must state for the record the considerations taken into account and the factual basis for the sentence imposed. La.Code Crim.P. art. 894.1 B and C. The sentencing court need not recite the entire checklist of items which must be considered before imposing sentence, but the record must reflect that it adequately considered the guidelines. State v. Barnett, 96-2050, p. 12 (La.App. 1 Cir. 9/23/97), 700 So.2d 1005, 1013; State v. Galliano, 96-1736, p. 31 (La.App. 1 Cir. 6/20/97), 696 So.2d 1043, 1059, writ denied, 97-1963 (La.1/9/98), 705 So.2d 1098. Even *1202 without full compliance with article 894.1, remand is unnecessary when the record clearly reflects an adequate basis for the sentence. State v. Ledet, 96-0142, p. 17 (La.App. 1 Cir. 11/8/96), 694 So.2d 336, 346, writ denied, 96-3029 (La.9/19/97), 701 So.2d 163.
In this case, the trial court specifically discussed La.Code Crim .P. art. 894.1, and the record reflects an adequate basis for the maximum sentences Defendant received. In Holmes, the court upheld maximum sentences, stating:
Maximum sentences are appropriately imposed only for the most serious violation of the described offense and for the worst kind of offender. State v. McKnight, 98-1790, p. 24 (La.App. 1 Cir. 6/25/99), 739 So.2d 343, 359. Considering the deliberate steps and preparation required for the defendant to have committed the crimes, their serious and tragic nature, and the devastating losses to the victims and their families, we find the defendant and his crimes to be the worst kind in this class of offender and offense. We do not find that the sentences imposed herein were excessive.
Id. at 1135. Similarly, in the instant case, Defendant's criminal history and the force employed by him against his elderly victims both indicate that he is the worst in this class of offender and offense. Hence, the imposition of maximum sentences is not so grossly disproportionate to the severity of the crime so as to shock one's sense of justice. The maximum sentences in this case make a measurable contribution to acceptable penal goals. Thus, the sentences are not unconstitutionally excessive.
Defendant also argues that his sentences should not have been imposed consecutively. However, we note that the supreme court, in State v. Thomas, 98-1144, pp. 1-2 (La.10/9/98); 719 So.2d 49, 49-50, held:
Although Louisiana law favors concurrent sentences for crimes committed as part of a single transaction, La.C.Cr.P. art. 883; State v. Underwood, 353 So.2d 1013, 1019 (La.1977), a trial judge retains discretion to impose consecutive penalties on the basis of other factors, including the offender's past criminality, violence in the charged crimes, or the risk he or she poses to the general safety of the community. State v. Williams, 445 So.2d 1171, 1182 (La. 1984); State v. Jacobs, 371 So.2d 727, 732-33 (La.1978) (on reh'g). In this case, the assault planned and executed by the defendant outside the St. Landry Parish Courthouse endangered deputies, court personnel, and the public alike. The defendant compounded the risk to the general public by fleeing with her husband and eluding capture for eight days. These circumstances provided the trial court with the particular justification for imposing consecutive sentences. On appellate review of sentence, the relevant question is "`whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.'" State v. Cook, 95-2784, p. 3 (La.5/31/96), 674 So.2d 957, 959 (quoting State v. Humphrey, 445 So.2d 1155, 1165 (La. 1984)), cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). In this context, a trial court "abuses its sentencing discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, i.e., when it imposes `punishment disproportionate to the offense.'" State v. Soraparu, 97-1027 (La.10/13/97), 703 So.2d 608 (quoting State v. Sepulvado, 367 So.2d 762, 767 (La.1979)) (emphasis added).
*1203 As pointed out by the State, three of the four offenses for which Defendant was convicted were separate offenses, occurring at separate times, locations, and involving separate victims. Further, although counts two and three occurred at the same time, they involved not only Thompson, but also her two teenage grandchildren. Hence, the "favoring" of concurrent sentences pursuant to La.Code Crim.P. art. 883 is not relevant to this case because three of four of the offenses in question are not part of a single transaction.
Nevertheless, consideration of Defendant's criminal history, the violence inherent in the instant offenses, and the threat to society presented by him, as revealed in court by his several outbursts, would make consecutive sentences within the trial court's discretion. As the trial court noted, the most compelling reason for imposition of maximum sentences is Defendant's criminal history. That also serves as "particular justification" for the imposition of consecutive sentences. We find that the trial court acted within its discretion in imposing maximum sentences and in imposing them consecutively. Therefore, this assignment of error has no merit.

CONCLUSION
Defendant's convictions and sentences are affirmed. The case, however, is remanded, and the trial court is instructed, to amend the minutes and the commitment order to reflect Defendant's sentence for armed robbery was ordered to be served without benefit of probation, parole, or suspension of sentence. Also, upon remand, the trial court is instructed to inform Defendant of the provisions of La. Code Crim.P. art. 930.8 by sending appropriate written notice to him within ten days of the rendition of this opinion and to file written proof of his receipt of the notice in the record of the proceedings.
AFFIRMED AND REMANDED WITH INSTRUCTIONS.
NOTES
[1] The children's initials are used to protect their identity.
[2] Nettie Thompson, who was seventy-two at the time of this incident, died before trial.