STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

10-881

STATE OF LOUISIANA

VERSUS

JAMIE FRANCISCO

**********

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 151,676-B
HONORABLE WILLIAM J. BENNETT, DISTRICT JUDGE

**********

JAMES T. GENOVESE
JUDGE

**********

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and James T. Genovese, Judges.

AFFIRMED.

Angelo J. Piazza, III
Post Office Box 429
Marksville, Louisiana 71351
(318) 253-6423
COUNSEL FOR DEFENDANT/APPELLANT:
     Jamie Francisco

Charles A. Riddle, III
District Attorney – Twelfth Judicial District
Anthony F. Salario – Assistant District Attorney
Post Office Box 503
Marksville, Louisiana 71351
(318) 240-7123
COUNSEL FOR APPELLEE:
     State of Louisiana

**GENOVESE, Judge.**

In this criminal case, Defendant, Jamie Francisco, appeals his second degree battery conviction and sentence, alleging insufficiency of the evidence and excessiveness of the sentence. For the following reasons, we affirm both Defendant's conviction and his sentence.

## FACTS AND PROCEDURAL HISTORY

On June 26, 2009, Defendant physically assaulted his girlfriend, Melissa Frugé (Melissa). As a result of the assault, Melissa was bruised about her body and suffered a broken rib. She was also rendered unconscious for a brief period of time.

On August 11, 2009, Defendant was charged by bill of information with second degree battery, a violation of La.R.S. 14:34.1. Following a bench trial, Defendant was found guilty as charged on April 13, 2010, and was sentenced on April 27, 2010, to five years at hard labor with credit for time served. Defendant filed a *pro se* motion to reconsider sentence, which was denied without a hearing on May 18, 2010.

Defendant is now before this court on appeal, asserting that there was insufficient evidence to support his conviction and that his sentence is excessive. Defendant has also requested an error patent review of his case regarding any irregularities that represent a constitutional violation of his rights to a fair trial and sentence.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there are no errors patent.

## INSUFFICIENCY OF THE EVIDENCE CLAIM

By this assignment of error, Defendant argues that the trial court committed

reversible error when it convicted him of second degree battery with insufficient evidence. Defendant also maintains that the trial court erred in denying his motion for a new trial and for reconsideration of his sentence.[1]

The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

A "[b]attery is the intentional use of force or violence upon the person of another; or the intentional administration of a poison or other noxious liquid or substance to another." La.R.S. 14:33. Second degree battery is defined in La.R.S. 14:34.1(A) as "a battery when the offender intentionally inflicts serious bodily injury[.]" Pursuant to La.R.S. 14:34.1(B), serious bodily injury "involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death." As noted by this court in *State v. Robinson*, 549 So.2d 1282, 1284-85 (La.App. 3 Cir. 1989):

---

[1]The denial of Defendant's motion to reconsider sentence is discussed in his excessive sentence claim.

To convict a person of second-degree battery, the State must prove the following elements beyond a reasonable doubt: (1) the intentional use of force or violence upon the person of another; (2) without the consent of the victim; and, (3) when the offender has specific intent to inflict serious bodily injury. *State v. Fuller*, 414 So.2d 306 (La.1982). Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10(1). Moreover, specific intent is a state of mind which need not be proven as a fact, but may be inferred from the circumstances of the transaction and actions of the defendant. *State v. Fuller*, *supra*.

On appeal, Defendant contends that no reasonable trier of fact could conclude he is guilty of second degree battery beyond a reasonable doubt considering the "scant" evidence at trial. Defendant complains of the following "inconsistencies and acquittal evidence:"

1. Melissa's abuse of the legal process against Defendant;

2. Melissa told Defendant of her whereabouts on the morning of the offense;

3. Melissa engaged in a love-hate relationship with Defendant; and,

4. Melissa's delay in seeking treatment for her injuries until the next day.

Defendant concludes that Melissa was unreliable, untruthful, and manipulative. Additionally, Defendant maintains that letters from Melissa to Defendant during his incarceration clearly define her motive in fabricating the offense, i.e., if she could not have Defendant, then no one else could have him. Also, the testimony of Jessie Edwards demonstrates the level of her lies and deceit. Lastly, Defendant asserts that the emergency room doctor could not connect Melissa's alleged injuries to the reported offense, and there was no evidence of unconsciousness.

At trial, Melissa testified that on June 26, 2009, she was walking to work and

3

stopped at Mary Phillips's house to get a cup of coffee. She was "somewhat" dating Defendant at the time, and, while she was at Mary's house, he called her phone several times and sent numerous text messages. Melissa eventually answered her phone, thinking if she answered it, he would leave her alone. According to Melissa, Defendant told her that he had something for her. Melissa replied, "[T]he ass whipping you got for me I don't want this morning." She then hung up. Defendant continued to call, but Melissa would not answer the phone.

Soon thereafter, Defendant arrived at Mary's house in his car. Melissa stated she did not have the slightest idea how Defendant knew where she was. Defendant kept blowing his horn and telling her to come see. Melissa refused to comply. According to Melissa, she already knew what Defendant had for her, "an ass whipping," and she did not want it—she was tired of it. Defendant then jumped out of the car and told Melissa that if she would not come, he was going to come and get her. When she did not comply, Defendant approached the house where Melissa and Mary were sitting on the porch and told Melissa he wanted to talk to her. Melissa told him no because he was going to hit her, and she was trying to go to work.

Defendant then entered the porch and began beating Melissa on the side of her head and face. Next, Defendant caught her by the hair, dragged her off the chair, and slammed her into the door frame of the screen door, knocking her unconscious. Melissa testified that when she regained consciousness, she was on the ground by the steps, and Defendant was kicking and punching her. He kicked her in the behind, back, and side. Melissa assumed that Defendant put her in the car because, when she "woke up," she was in the front seat of his car. She was not able to get out because Defendant had control of the lock.

4

Melissa stated that once she was in the car, she kept quiet. There was no more violence while in the car. According to Melissa, they rode around for a couple of minutes, and then Defendant took her home and made her bathe and change clothes. He then took her to his house where he started "fussing" at her again about "this and that." Melissa testified that she was scared and that she had sex with Defendant, although she did not want to. Defendant eventually dropped her off at home the next morning. Melissa then called her aunt, who came over and called the sheriff's department. Melissa's aunt also took her to the doctor because her side was hurting, and she was having difficulty breathing.

Melissa identified photographs of her injuries. The photographs depicted bruising and swelling of the left side of her face in the cheek area and bruising on her left arm and leg. None of the photos depicted her trunk area, ribs, or stomach. Melissa admitted that the injuries to her face were hard to see in the photograph, but maintained that the swelling was visible "if you'd have seen it that day." Melissa reported that the pain in her ribs continued for about a month.

On cross-examination, Melissa admitted that she had recanted her allegations regarding the offense. Melissa explained that she went to see Judge Bennett, told him that her allegations were not true, and asked him to drop the charges against Defendant. Melissa maintained, however, that Defendant forced her to tell the judge that the offense did not happen. Defendant threatened to beat and/or kill her if she did not recant her story. Melissa complied with Judge Bennett's instructions to put her statement in writing and take it to the district attorney's office.

Next, Melissa was questioned about threats she allegedly made to Defendant. Melissa denied ever threatening Defendant. In response to same, defense counsel

introduced a three-page, handwritten letter from Melissa to Defendant and asked her to read it out loud.[2] The letter was dated November 30, 2009, and was sent to the Avoyelles Parish Sheriff's Department where Defendant was incarcerated. Melissa indicated in her letter that Defendant had hurt her, but she was going to be all right. Melissa then wrote, "If I was dirty[,] I would sign them papers and testify against you, and guess what, your punk ass gonna get to get [sic] 10 to 15 [years]." Melissa also wrote:

> so bye for now! And don't drop the soap! B--ch Nigga! See you-n-da courtroom[.] Was blind but now I see[—]2 broke ribs[,] 1 broke finger[,] 1 broke phone[,] [and] a broke face[.] Pay back is a mutha [sic]! Thanks 4 makin[g] me stronger and wiser[.]

Melissa was then asked a series of questions in an attempt to show she did not fear Defendant and/or continued to have a relationship with him after the offense. Melissa denied that she had been texting Defendant recently. She admitted, however, that she did send him a text message when she learned that his mother had died. Melissa maintained, however, that it was the only message she sent.

Melissa admitted to sending a text message on July 8, 2009, wherein she told Defendant that he had to choose between her and the other women with whom he had sexual relationships. She explained that the message was sent in response to Defendant's constant calls and text messages wherein he told her he loved her and wanted to be with her.

Melissa was then questioned about a specific text sent on August 6, 2009, and was asked to read the text from Defendant's phone. Melissa first acknowledged that the number from which the text message originated was her phone number.

---

[2]The letter is filled with profane statements. Only the statements which might be construed as threats to Defendant are addressed herein.

According to Melissa, the message, a chain letter from the internet, was sent to all of her contacts, and she had no recollection of intentionally sending it to Defendant. Melissa stated that she may have accidentally sent the text to Defendant.

Next, Melissa was questioned again about how Defendant knew she was at Mary's house. Melissa replied that she did not know; she might have told Defendant that she was at Mary's house, but she had no recollection. Melissa stated that she could not recall several incidents from that day.

On re-direct examination, Melissa confirmed that after the offense, the text messages from Defendant were constant, even when he was in jail. All she wanted was for him to leave her alone. Melissa testified that Defendant beat her on two more occasions after the instant offense, on July 25, 2009, and on July 29, 2009, prior to the time she went to Judge Bennett's office.

The State submitted into evidence a Petition for Protection from Abuse filed against Defendant by Melissa on July 23, 2009. In the protective order under "Past incidents," which she read aloud at trial, Melissa described the instant offense as follows:

> On June 26th[,] we had broken up for two weeks[.] [O]n my way walking to work, he kept calling my phone[;] I wouldn't answer. He texted me 32 times telling me to answer the phone [and] that I have something for you, which was a beating. I stopped at a friend[']s house to drink a cup of coffee, he found out where I was and came there bolstered [sic] his way into the house . . .[.]
>
> . . . .
>
> He bolstered [sic] his way into the house, picked me up, threw me at the wall, [and] knocked me out[.] [He then] picked me up, threw me outside on the ground, and began punching me, slapping me, kicking me[;] and he kicked me in my back right side and broke my ribs.

7

The testimony of Mary Phillips, the only witness to the offense, was consistent with Melissa's testimony and allegations. Mary testified that on June 26, 2009, she was sitting on her porch when she saw Melissa walking down the sidewalk. Mary stated that she had known Melissa for years. Melissa stopped to visit, and the two sat down on Mary's porch and began talking. During their visit, Melissa received three or four phone calls from Defendant. Melissa kept telling Defendant to stop calling and that she did not want to talk to him. According to Mary, Defendant asked Melissa where she was, and she told him that she was at Mary's house.

When Defendant arrived, he got out of his car, walked up to the porch, and told Melissa to come see. When Melissa refused, Defendant opened the screen door to the porch, walked over to where Melissa was sitting, and began beating her up while she was still sitting in the chair. He then snatched her up out of the chair and began dragging her from the porch. Melissa's head slammed into the frame of the door, and she hit her head on a small step. Defendant then dragged her off the porch and started kicking her in the side. According to Mary, Melissa was unconscious for a few seconds, and he continued to kick her in the side and all over, telling her to "get up you b - - ch." When Melissa regained consciousness, she pleaded with Defendant not to kill her. Next, Defendant grabbed Melissa by the hair, dragged her to the car, and pushed her into the car. The Defendant then drove off with her.

Mary called the police, and, while the police were still there, Defendant had Melissa call her to instruct her not to press charges against him. Mary stated she was afraid to press charges against Defendant because she thought he would then hurt Melissa. Mary was worried about Melissa and did not see her again until a few weeks

8

later. Mary believed that the beating was bad enough that Melissa should have gone to the hospital that same day.

Defendant's recollection of the events on June 26, 2009, differed significantly from the testimony of Melissa and Mary. Defendant testified that he contacted Melissa that day, and she told him she was at Mary's house. When he pulled up, Melissa ran out of the house, "slipping and falling all over the place." According to Defendant, Melissa was excited to see him. She then got in the car, and they took a ride. Next, they went to Defendant's house and just relaxed. He denied having sexual intercourse with her that day.

When asked why Melissa would fabricate such a story, Defendant stated it was likely because she did not want to be with him or because someone else was involved. Defendant denied hitting and kicking Melissa that day. According to Defendant, Melissa started coming forward with charges after he broke up with her and began dating Jacqueline Batiste. Defendant maintained that Melissa threatened to have him thrown in jail. He stated she told him that if he would help her out with certain things, such as money or a ride to work, that she would drop the charges. Defendant maintained that Melissa's allegations were lies and that he never asked her to lie to a judge or a district attorney and report that the offense never happened.

On cross-examination, Defendant testified that he had been dating his girlfriend, Jacqueline, for eight or nine years and that Melissa was just a friend. Defendant did not tell Jacqueline he was having sex with Melissa, because they were not married. Defendant continued to maintain that he never beat Melissa and that all of her allegations were fabricated. With regard to Melissa's broken rib and bruises,

Defendant contended that he never touched her and that she must have injured herself when she came down the stairs and fell.

According to Defendant, Melissa and Tangela Crockett, another woman who claimed she had been assaulted by Defendant, fabricated their stories because of a "triangle." Defendant explained that he was first in a triangle with Tangela. When Tangela became unhappy with his way of living, i.e., working odd jobs with no steady employment, he found another lady, Melissa. In between the years, Defendant was "with" Jacqueline and was helping to raise her child. Defendant claimed that Tangela and Melissa did not like the fact that he was trying to be a family man and take care of his business.

Defendant added that Melissa and Tangela teamed up to help one another with their respective cases against him to convince the trial court that he committed the offenses. Defendant maintained that he was a victim of their conspiracy against him.

Next, Defendant's first cousin, Jessie Andrews, testified on Defendant's behalf. Jessie stated that he had known Melissa his entire life. He also asserted that he knew about her relationship with Defendant and that the relationship had been a good one.

With regard to the instant offense, Jessie testified that on July 30, 2009, the day after Defendant's arrest, he accompanied Melissa to Judge Bennett's office to drop the charges filed against Defendant arising out of the instant offense. Defendant was incarcerated at the time. According to Jessie, when Melissa spoke to Judge Bennett, she reported that she was just mad and angry at the time and that the offense did not happen. Afterwards, Jessie and Melissa went to the bank with Defendant's mother, who withdrew $500 and gave it to Melissa to pay a bill.

10

On cross-examination, Jessie testified that if he could help it, he did not want to see Defendant go to jail. Jessie also stated that he was not at Mary's house on June 26, 2009, the day of the offense, and thus, did not see what happened. Jessie maintained that the money given to Melissa by Defendant's mother after Melissa recanted the allegations against Defendant was not a bribe to get Melissa to drop the charges. Jessie acknowledged that Defendant had been in trouble before, but denied knowledge of Defendant's six arrests for beating up women. Jessie recalled that Defendant had gone to court regarding a girl's allegations that he and his mother jumped on her. Jessie denied any knowledge of Defendant's reputation for beating women and maintained that he never saw Defendant fight with a woman.

Jacqueline testified at trial that he was her high school sweetheart and her future fiancé. She had known Defendant for eight years and had been dating him off and on. Jacqueline stated that she did not know Melissa personally, but that she had seen Melissa in the car with Defendant. Melissa never attempted to contact Jacqueline but, instead, caused "confusion" with Defendant, which in turn affected Jacqueline. According to Jacqueline, she had been present when Melissa stalked Defendant and then called the police to report he was stalking her. Jacqueline denied having any personal knowledge of Defendant's involvement with Melissa on June 26, 2009. Also, Jacqueline was not with Defendant on the night of June 26, 2009.

Caprice Dixon was called by Defendant as a character witness. Caprice testified that she knew Defendant. Her relationship to Defendant, however, was not established. Caprice indicated that she was not present at Mary's house when the offense occurred, and she had no knowledge of the incident. According to Caprice, Defendant did not hit women, and she never knew him to hit anyone. Although she

11

had heard that Defendant was involved in ten different incidents of violence with two different women and had violated protective orders filed against him, Caprice maintained that Defendant did not have a reputation in the community as someone who beats women.

When asked if she had ever seen any violence between Defendant and Melissa, Caprice stated that they had a love-hate relationship. One minute, they were in love; the next minute, Melissa was pressing charges against him. Caprice had never talked with Melissa about her relationship with Defendant. She was aware, however, that Defendant had been arrested on multiple occasions based on Melissa's allegations. Caprice never saw Defendant strike Melissa.

With regard to the injuries Melissa sustained as a result of the offense, Dr. Christopher Ritter, Melissa's treating physician in the emergency room at Avoyelles Hospital, was called to testify. Dr. Ritter stated that he examined Melissa on June 27, 2009, at 11:00 a.m. During the exam, Melissa reported that she had been assaulted on June 25th and June 26th. She stated that she had been hit with a fist, kicked, pushed, thrown, and had lost consciousness when she was struck on June 26th. Based on her history and his examination, Dr. Ritter had no reason to doubt that Melissa lost consciousness during the assault. She suffered from pain in her neck, back, face, chest, and both hips.

Photographs taken of Melissa at the request of police were shown to Dr. Ritter at trial. Dr. Ritter found it difficult to make out the victim's injuries in the photographs. The photographs depicted the victim's arm, mid to lower back, leg, left cheek, and neck area, where bruising was noted. Dr. Ritter stated that the photographs were consistent with Melissa's history and his examination. X-rays of

her chest revealed a fracture of the ninth rib, which was consistent with Melissa's history. Dr. Ritter subsequently opined that Melissa's injuries were caused by the physical assault she described.

On cross-examination, Dr. Ritter testified that Melissa's bruises did not look several days older than she reported. He explained that as bruises get older, they change colors, a process that is sometimes difficult to see in a dark-skinned individual. According to Dr. Ritter, it can be difficult to pinpoint the location of bruises in dark-skinned individuals. In a photograph of Melissa shown to Dr. Ritter at trial, he did not see "greening" of the bruise associated with an aging bruise. As such, Dr. Ritter did not characterize the bruise as an "old" bruise. With respect to her photographs, Dr. Ritter did not find any facial lacerations or major contusions. He also testified that he did not find any tenderness in the area of her face. The bruising on Melissa's arm was the size of a golf ball and was irregular in shape. When considering the photographs alone, Dr. Ritter stated that Melissa's injuries did not look severe.

Based on Dr. Ritter's experience, he did not find Melissa's history of being beaten two days prior to presenting to the hospital unusual. In fact, Dr. Ritter stated that it was common. Dr. Ritter agreed that at the time she was seen, Melissa's injuries were not emergent. Although he frequently finds evidence of discoloration from a punch or contusion, Dr. Ritter testified that such evidence is not always visible, particularly in dark-skinned individuals. Dr. Ritter stated that rib fractures are frequently seen without visible bruising in the area. Also, Dr. Ritter stated that pulmonary contusions are rarely seen with a rib fracture and that a pneumothorax is a rare complication of a rib fracture.

Although Dr. Ritter concluded that Melissa's injuries were not emergent, he felt it was appropriate for her to be seen in the emergency room with her history of trauma and complaint of pain in the area of her ribs. He added that it was important to rule out other more serious problems. Lastly, Dr. Ritter testified that a rib fracture is consistent with trauma in an otherwise young and healthy person. According to Dr. Ritter, a rib fracture does not result from a trivial event.

In finding Defendant guilty as charged, the trial court provided the following reasons:

BY THE COURT:

Well[,] what is uncontradicted is [that] on June 26th, 2009[,] Melissa Frugé walked about two or three miles from her home on Mayeaux Road to the Spirit store in Marksville to pay a utility bill. Then[, she] was walking towards work down Martin Luther Kind [sic] Drive a few blocks away from the Spirit station. She say [sic] her friend[,] Mary Phillips[,] [was] on her front porch[ ] [and she] stopped to have a cup of coffee with . . . [her] on her front porch. Uncontradicted at that point, no question that's where she was, that's where Ms. Phillips was[—]everything is rocking and rolling.

Ms. Frugé testifies that she had been receiving text messages and phone calls from Jamie Francisco[.] [S]he not only said it today in court, she said it the day she filed the charges, [and] she said it a month later when she filed for a protective order when talking about past incidents. Her story stayed the exact same all along about what happened. And we have the testimony of Mary Phillips. She don't [sic] have a dog in this hunt. She was just there. She watched the event. She saw what happened[;] she testified as to what happened.

You know what was said about Ms. Phillips bad [sic] to inpuine [sic] her character. That she drinks, well nobody said she was drinking anything at 8:00 o'clock on that morning other than coffee. And she testified as to what she saw.

So what did happen? Well Jamie Francisco admits that Melissa Frugé hurt herself, got hurt, [and that] she was hurt that day. He didn't take her to the doctor, they rode around all day[,] and they went to her house, his house, [and then] went to her house to get clothes so she would have for work the next day. [She] [d]ecided not to go to work that day. Didn't . . . going [sic] to go to his house that night[,] but he

14

said they didn't have sex[.] [A]nd the next morning[,] although she has her clothes for work, instead of taking her to work or letting her walk two blocks from his house to where she works, he takes her three miles back home to Mayeaux Lane. You talk about not make any sense.

After I heard the testimony of Ms. Frugé, Ms. Phillips, and the doctor confirming that what he found on Ms. Frugé was consistent with what she described as a kind of beating she received, I expected Jamie Francisco's defense to be she came at me, we fought, [and] I was defending myself. I mean I was waiting for it[;] I was waiting for it. Man[,] Judge, what happened was we got in an argument, she came [sic] me, I was defending myself[,] and she got hit. But did he say that? No. He said she was so excited to see me, they hadn't been together for two weeks, they were broken up, but she was so excited to see him [that] she ran off the porch, . . . fell down the steps[,] and hurt herself. And that's what happened to her to break her ribs and cause these bruises. But he was not concerned enough to take her to the doctor.

I mean the defense that was put forth[—]I mean you talking about wild[—]this triangle that's trying to get Jamie Francisco just didn't prove out to be anything trying to get Jamie Francisco.

It's undisputed that Melissa Frugé was beat [sic] up on June 26th, 2009, had fractured ribs, [and] lost consciousness that meets the definition of serious bodily injury in Revised Statute 14:34.1.

It is also clear[,] as the day is long[,] that force or violence was used against Melissa Frugé by Jamie Francisco on that date intentionally.

Mary Phillips witnessed it[.] [F]orget about what Melissa said[.] [F]orget about Melissa[.] Mary Phillips saw the whole thing[;] she was sitting right there. They called somebody in her house [sic] called the police. But what happened with Melissa[?] [W]hy did she go with him when he was pulling her hair and putting her in the car? Why did she stay with him that night? I've been waiting for somebody to say it all along[,] and Miché Moreau said it in her closing argument[.] [I]t's the classic battered woman syndrome. Why is she still writing him a letter[?] [W]hy did she send him a text when Ms. Hazel died, saying she was sorry[?] I mean this lady loved this man, at one point. She loved him[,] and she wasn't treated right[,] and that love didn't just go away. And this letter here, that letter's nasty. And yeah[,] at that point, she's ready for him to get what he deserves for what he did to her that day[,] and who knows, possibly some other days. But this is an overwhelming not even close case.

Whereas the State has totally proved beyond any reasonable doubt whatsoever that Jamie Francisco used for [sic] of [sic] violence upon

Melissa Frugé on June 26th, 2009 without her consent, inflicting serious bodily injury[,] and accordingly, I find him guilty as charged.

Considering the testimony and evidence found in the record, we find that the trial court did not err in convicting Defendant of second degree battery. Defendant's assertion that the evidence at trial was scant is not supported by the record. Melissa's recollection of the offense at trial was corroborated by an eyewitness to the physical assault, both of which establish that Defendant intentionally used force and violence, without Melissa's consent, with the specific intent to inflict serious bodily injury. Also, Dr. Ritter's testimony, the medical records, and the photographs support Melissa's allegations that she was beaten and kicked by Defendant. Lastly, the trial court found Defendant's testimony was not credible, and it provided little to no support in refuting Melissa's claim.

With regard to Melissa's credibility, notwithstanding the evidence that she recanted her allegations of the offense before Judge Bennett prior to trial, the record is void of any evidence to support Defendant's contention that she abused the legal process against him. As for the inconsistency in Melissa's testimony regarding whether or not she told Defendant of her whereabouts on the morning of the offense, we find that this factual detail is minor and plays only a small part, if any, in challenging the credibility of her testimony or allegations.

Additionally, the testimony of defense witness, Caprice, indicating that Defendant and Melissa had a love-hate relationship, was only sketchy and lacked credibility. It played no part in challenging the credibility, reliability, and truthfulness of Melissa's testimony. Defendant failed to establish the extent of his relationship with Caprice and how she had any knowledge of his relationship with Melissa.

16

Lastly, the letter from Melissa to Defendant while he was incarcerated does not support Defendant's claim that she had a motive in fabricating the claim. Nowhere in the letter does Melissa state that if she could not have Defendant, then no one else could have him. Despite Defendant's assertion, the testimony of Jessie, his cousin, does not show that Melissa was lying or was deceitful as claimed by Defendant. Not only did Jessie have a vested interest in protecting Defendant, his testimony was not credible, as noted by the trial court.

With regard to the evidence connecting Melissa's injuries to the offense, Dr. Ritter clearly indicated that the physical exam, the x-ray revealing a rib fracture, and the photographs depicting bruises were consistent with the offense as reported by Melissa. Although there was no physical evidence to prove Melissa lost consciousness, the unrefuted testimony of both Melissa and Mary establishes that she lost consciousness for a brief time during the assault—a fact Dr. Ritter had no reason to doubt.

Also, Dr. Ritter did not indicate that there was no bruising in the area of Melissa's rib fracture. As noted in the record, Dr. Ritter stated that a rib fracture was seen on the x-ray and that Melissa had tenderness in the area of the fracture. When shown a photograph purportedly of Melissa's thorax, Dr. Ritter was unable to visualize any landmarks of the thorax to determine whether or not a contusion could be seen in the area of the fracture. Even if there was no bruise in the area of the rib fracture, according to Dr. Ritter, such an occurrence was not uncommon, especially in dark-skinned individuals.

For the reasons stated herein, we find that the evidence was sufficient to convict Defendant of second degree battery and that the trial court did not err in

denying his motion for a new trial. Accordingly, Defendant's conviction is affirmed.

## EXCESSIVE SENTENCE CLAIM

In this assignment of error, Defendant argues that his sentence is excessive.

In *State v. Brandenburg*, 06-1158, p. 28 (La.App. 3 Cir. 2/7/07), 949 So.2d 625, 644, *writs denied*, 07-538, 07-614 (La. 10/26/07), 966 So.2d 571, 573, this court stated:

> The trial court has wide discretion in imposing a sentence, and a sentence imposed within the statutory limits will not be deemed constitutionally excessive absent a manifest abuse of discretion. *State v. Evans*, 97-504 (La.App. 3 Cir. 10/29/97); 702 So.2d 1148, *writ denied*, 97-2979 (La.4/3/98); 717 So.2d 231. This court, in *State v. Dubroc*, 99-730, p. 22 (La.App. 3 Cir. 12/15/99); 755 So.2d 297, 311, noted:
>
>> The relevant question on review of a sentence is whether the trial court abused its broad sentencing discretion and not whether the sentence imposed may appear harsh or whether another sentence might be more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). To constitute an excessive sentence, this court must find the penalty imposed is so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals; and, therefore, it is nothing more than needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court is given wide discretion in imposing a sentence, and a sentence imposed within statutory limits will not be deemed excessive in the absence of manifest abuse of discretion. *State v. Pyke*, 95-919 (La.App. 3 Cir. 3/6/96); 670 So.2d 713.

> *State v. Boudreaux*, 00-1467, p. 12 (La.App. 3 Cir. 4/4/01), 782 So.2d 1194, 1201, *writ denied*, 01-1369 (La.3/28/02), 812 So.2d 645 (quoting *State v. Dubroc*, 99-730, p. 22 (La.App. 3 Cir. 12/15/99), 755 So.2d 297, 311). "As a general rule, maximum sentences are appropriate in cases involving the most serious violation of the offense and the worst type of

offender." *State v. Hall*, 35,151, p. 4 (La.App. 2 Cir. 9/26/01), 796 So.2d 164, 169.

The penalty for second degree battery is not more than five years, with or without hard labor, or a fine of not more than two thousand dollars, or both. La.R.S. 14:34.1(C). As such, Defendant's five-year sentence was the maximum possible sentence he could have received. Defendant, however, was spared a fine.

At sentencing, Defendant asserted that his mother and father were deceased and urged the trial court to give him another chance. Defendant maintained that he would do "what's right." Defendant added that he had a lot of things he needed to take care of since his mother passed away.

After reviewing Defendant's extensive criminal history, the trial court concluded that since 1998, he had been convicted of six felonies, including convictions for felony theft, illegal possession of stolen things, unauthorized use of an access card, and forgery. Also, he had been arrested numerous times on a variety of charges. Since the time he was charged for the instant offense, Defendant had three felony arrests for domestic abuse battery, two arrests for trespassing, one arrest for aggravated battery, two arrests for violation of protective orders, and one arrest for stalking. Accordingly, the trial court concluded that not only would a probated sentence be an illegal sentence, considering the guidelines set forth in La.Code Crim.P. art. 894.1, there was an undue risk that he would commit another crime during any period of a suspended sentence. Also, the trial court found that Defendant was in need of correctional treatment or a custodial environment and that any lesser sentence would deprecate the seriousness of his offense.

Next, the trial court stated it had considered the aggravating and mitigating factors set forth in La.Code Crim.P. art. 894.1 in sentencing Defendant. First, the trial

19

court found aggravating that Defendant's conduct during the commission of the offense manifested cruelty to the victim. He knew or should have known that the victim, a woman, was vulnerable or incapable of resistance and that bodily harm and violence were involved in the commission of the offense. Lastly, the trial court stated that it could not find any mitigating circumstances that applied to Defendant's conduct in the offense.

In support of his excessive sentence claim, Defendant refers to *State v. Tisby*, 33,591 (La.App. 2 Cir. 6/21/00), 764 So.2d 209, *writ denied*, 00-2236 (La. 6/1/01), 793 So.2d 181, wherein the defendant was convicted of second degree battery and sentenced to two and one-half years at hard labor. The defendant and his girlfriend were guests at a barbeque when the defendant forcibly removed his girlfriend from the gathering and took her home. Afterwards, the victim went to the defendant's house to check on the defendant's girlfriend. When the victim tried to enter the house, the defendant swung a sling blade at him, cutting him across the face. At sentencing, the trial court noted the defendant's criminal history, which included a conviction for simple robbery, reduced by plea agreement from a first degree robbery charge, and convictions for driving while intoxicated. Also, the forty-year-old defendant was the father of three children and a high school graduate who had served three years in the military. The sentence was affirmed on appeal.

However, this court has affirmed the maximum five-year sentence for second degree battery in similar cases. Most recently, in *State v. Thomas*, 08-1280 (La.App. 3 Cir. 4/1/09), 7 So.3d 802, the defendant was involved in a physical altercation with the victim and stabbed him in the neck and twice in the back with a knife. On appeal, the court found that the sentence was not excessive, considering the defendant's

20

criminal history as a second felony offender. He also had four misdemeanor convictions and approximately twenty-eight separate encounters with law enforcement agencies, fifteen of which were classified as crimes against a person. The court also found that the evidence supported the greater charged offense of aggravated battery and that a subsequent jailhouse fight wherein the defendant beat the victim demonstrated a patent lack of remorse.

In *State v. Hopkins*, 96-1063 (La.App. 3 Cir. 3/5/97), 692 So.2d 538, the defendant received the maximum sentence and was fined $2,000 after his conviction of second-degree battery. The defendant was involved in an argument with the victim and beat her on her bare buttocks with a thick branch, leaving a four-inch bruise. In affirming the sentence on appeal, this court found that the evidence supported the greater charged offense of aggravated battery. No other aggravating or mitigating factors were addressed on appeal.

Considering the brutal beating of the victim in the instant case and Defendant's significant criminal history, we find that the trial court did not abuse its discretion when it imposed the maximum sentence. We likewise find that Defendant is clearly one of the worst offenders, for whom a maximum sentence is intended. Also, the sentence is commensurate with sentences affirmed by this court in comparable cases. Accordingly, Defendant's sentence is affirmed.

## DISPOSITION

Defendant's conviction and sentence are affirmed.

**AFFIRMED.**