# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-810


**STATE OF LOUISIANA**

**VERSUS**

**CLYDE SANTON DISEDARE, JR.**
**A/K/A CLYDE SANTON DISEDARE**


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 62237
HONORABLE LAURIE A. HULIN, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**PHYLLIS M. KEATY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Phyllis M. Keaty, and Van H. Kyzar, Judges.


**AFFIRMED.**

**Keith A. Stutes**
**District Attorney**
**John V. Ghio**
**Assistant District Attorney**
**100 North State Street, Suite 215**
**Abbeville, Louisiana  70510**
**(337) 898-4320**
**Counsel for Appellee:**
  **State of Louisiana**

**Edward K. Bauman**
**Louisiana Appellate Project**
**Post Office Box 1641**
**Lake Charles, Louisiana  70602-1641**
**(337) 491-0570**
**Counsel for Defendant/Appellant:**
  **Clyde Santon Disedare, Jr.**

**Clyde Santon Disedare, Jr.**
**In Proper Person**
**Rayburn Correctional Center**
**27268 Highway 21**
**Angie, Louisiana  70426**
**Defendant/Appellant**

**KEATY, Judge.**

Defendant appeals his convictions and sentences. For the following reasons, Defendant's convictions and sentences are affirmed.

**FACTS & PROCEDURAL BACKGROUND**

On September 5, 2017, Defendant, Clyde Santon Disedare, Jr., was charged by bill of information with two counts of second degree rape, violations of La.R.S. 14:42.1; second degree battery, a violation of La.R.S. 14:34.1; false imprisonment, a violation of La.R.S. 14:46; and simple arson, a violation of La.R.S. 14:52. On October 25, 2017, an amended bill of information was filed, charging Defendant with two counts of second degree rape, violations of La.R.S. 14:42.1; second degree battery, a violation of La.R.S. 14:34.1; false imprisonment while armed with a dangerous weapon, a violation of La.R.S. 14:46.1; simple arson, a violation of La.R.S. 14:52; domestic abuse aggravated assault, a violation of La.R.S. 14:37.7; and domestic abuse battery by strangulation, a violation of La.R.S. 14:35.3(L). Defendant's estranged wife, Stacey Disedare, was the victim in all counts. The events or crimes at issue occurred during an approximate thirteen-hour period between July 25, 2017 through July 26, 2017.

On October 2, 2017, Defendant filed a pro se Motion for Fast and Speedy Trial, which the trial court set for hearing on October 26, 2017. Defendant's motion was continued to November 16, 2017, although defense counsel refused to adopt the motion. On February 26, 2018, Defendant waived his right to a jury trial and elected a bench trial. Another Waiver of Constitutional Right to a Jury Trial was filed on September 17, 2018. On October 11, 2018, defense counsel filed a Motion to Quash and argued the two counts of second degree rape should be quashed as duplicitous; the motion likewise claimed the second degree battery and the domestic abuse battery by strangulation were duplicitous and should be

quashed. The motion was set for hearing on October 25, 2018, although it was subsequently continued by defense counsel to November 8, 2018. The motion was never ruled upon.

Defendant's bench trial began on April 17, 2019, and concluded on April 18, 2019. He was found guilty as charged on all counts except count four, i.e., vaginal second degree rape. On June 27, 2019, Defendant was sentenced as follows: for second degree rape, "thirty years at hard labor to serve, two years imposed without benefit"; for second degree battery, seven years at hard labor; for false imprisonment while armed with a dangerous weapon, nine years at hard labor; for simple arson, four years at hard labor; for domestic abuse by aggravated assault, four years at hard labor; and for domestic abuse by strangulation, two years at hard labor. The sentences were ordered to run concurrently to each other but consecutive to any sentence he may have been already serving. Defendant was ordered to register as a sex offender for the remainder of his life.

Defendant now appeals his convictions and sentences for second degree rape, second degree battery, false imprisonment while armed with a dangerous weapon, simple arson, and domestic abuse by aggravated assault. He contends there was insufficient evidence to convict him and argues his convictions should be vacated, and he should be entitled to a new trial based because a sanity commission was ordered but never concluded. As a raised error patent, Defendant contends his sentence for second degree rape is indeterminate because the trial court failed to specify which benefits were restricted for two years. Defendant has also raised the following five assignments of error pro se: the State's failure to perform DNA testing on oral swabs taken from the victim constitutes a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963); the trial court erred in failing to rule upon Defendant's motion to quash; Defendant's sentence is invalid under La.Code

2

Crim.P. art. 872; there was insufficient evidence to convict him of second degree rape; and the victim's testimony at trial was perjury.

## DISCUSSION

**I.    Errors Patent**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find two possible errors patent raised. They are discussed below as an assigned error patent and in Assignment of Error No. 1.

Defendant's brief raises an error patent that the trial court failed to specify which benefits were restricted when it sentenced him for second degree rape to serve "thirty years at hard labor . . . , two years imposed without benefit." Defendant contends the trial court's failure to list which benefits are restricted renders the sentence indeterminate and necessitates remand as provided in *State v. Ducote*, 18-60 (La.App. 3 Cir. 11/14/18), 260 So.3d 627, *writ denied*, 18-2026 (La. 4/22/19), 268 So.3d 298. The State concedes that this may be an indeterminate sentence which needs to be corrected if this court so rules, also citing *Ducote*.

Pursuant to La.R.S. 14:42.1(B), "[a]t least two years of the sentence imposed shall be without benefit of probation, parole, or suspension of sentence." According to La.R.S. 15:301.1(A):

> When a criminal statute requires that all or a portion of a sentence imposed for a violation of that statute be served without benefit of probation, parole, or suspension of sentence, each sentence which is imposed under the provisions of that statute shall be deemed to contain the provisions relating to the service of that sentence without benefit of probation, parole, or suspension of sentence. The failure of a sentencing court to specifically state that all or a portion of the sentence is to be served without benefit of probation, parole, or suspension of sentence shall not in any way affect the statutory requirement that all or a portion of the sentence be served without benefit of probation, parole, or suspension of sentence.

3

In *State v. Patterson*, 16-1104, p. 8 (La.App. 4 Cir. 3/7/18), 241 So.3d 433, 440, *writ denied*, 18-611 (La. 2/11/19), 263 So.3d 897, the fourth circuit explained, "[p]ursuant to La. R.S. 15:301.1 A and *State v. Williams*, 2000-1725, pp. 10-11 (La. 11/28/01), 800 So.2d 790, 798-799, a sentence is deemed to have been imposed with these restrictions of benefits even in the absence of the district court delineating them."

Additionally, Defendant's reliance on *Ducote* is misplaced. Although this court in *Ducote* remanded for resentencing, the remand was based on the time frame of said restrictions rather than upon the trial court's failure to specify which restrictions were imposed. *Ducote*, 260 So.3d 627. *Ducote* is one of many cases wherein Louisiana courts have remanded a sentence for resentencing when a trial court, that has been granted discretion over the amount of time probation, parole, or suspension of sentence may be restricted, failed to exercise that discretion and instead repeated the statute's language that at least X number of years be without benefit. That issue is not present in this case because the trial court specified two years of Defendant's sentence were to be without benefits. The need for the trial court to specify which benefits are restricted is obviated by La.R.S. 15:301.1(A). By operation of law, Defendant's sentence is to be served without benefit of probation, parole, or suspension of sentence. There is no need for this court to remand Defendant's sentence.

We find this assignment of error lacks merit.

## II. Assignment of Error No. 1

In his first assignment of error, Defendant contends the trial court erred in allowing defense counsel to not adopt the motion and cancel the Motion for Sanity Hearing and proceed to trial without a resolution of Defendant's competency. We find this assignment of error is based upon appellate counsel's erroneous belief that

4

Defendant filed a pro se Motion to Appoint Sanity Commission. This error stems from a typographical error in the trial court's minutes dated October 26, 2017, which stated: "SANITY HEARING set for today. The Defense moved to CONTINUE this matter to 11/16/2017 with no objection. The defendant was represented by counsel XAVIER ALEXANDER who is NOT ADOPTING this motion. The Court so ordered."

According to a footnote in his brief, appellate counsel interpreted this minute entry and the lack of a Motion to Appoint Sanity Commission in the record to indicate Defendant submitted the motion pro se. However, no such motion was filed nor was a sanity commission appointed. The Vermilion Parish Clerk of Court submitted a corrected minute entry for October 26, 2017, which states the motion scheduled for hearing that day was a motion for speedy trial which Defendant filed in proper person. The corrected minute entry was accompanied by an affidavit affirming there was a typographical mistake. We further note that a pro se Motion for Fast and Speedy Trial was filed on October 2, 2017, and scheduled for hearing on October 26, 2017. Since the motion in question on October 26, 2017 was a motion for speedy trial rather than a motion to appoint a sanity commission, Defendant's claim lacks merit.

Furthermore, to the extent Defendant argues La.Code Crim.P. art. 642 prohibits the trial court from moving forward in a case once a defendant's mental capacity to proceed is brought into question, this argument lacks merit. Defendant complains that because the trial court ordered him to undergo a psychiatric evaluation as a condition of bail, the trial court indicated it was concerned with Defendant's competency. We find no evidence the trial court was concerned with Defendant's competency to stand trial. Although the trial court ordered Defendant to undergo a psychiatric evaluation, that condition of bail arose from the Louisiana

5

Uniform Abuse Prevention Order issued on July 31, 2017, in accordance with the trial court's ruling during the Gwen's Law hearing held the same day. The trial court ordered the psychiatric evaluation by simply checking a box on the form, which sets out fourteen specific conditions of the order which are routinely set. With no other evidence to indicate the trial court was concerned with Defendant's mental capacity to proceed to trial, this assignment of error lacks merit.

**III.   Assignment of Error No. 2 and Pro Se Assignment of Error No. 4**

In Defendant's second assignment of error and fourth pro se assignment of error, he contends there was insufficient evidence to convict him of second degree rape. Both assignments of error argue, either directly or indirectly, that the failure to conduct DNA testing on the oral swabs taken from Mrs. Disedare was an error that prevented Defendant from proving his innocence of the oral second degree rape. Pursuant to La.R.S. 14:42.1(A)(1), the State must prove the rape occurred "[w]hen the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape." Defendant contends the State failed to prove this element of the offense and cites *State v. Powell*, 438 So.2d 1306 (La.App. 3 Cir.), *writ denied*, 443 So.2d 585 (La.1983), for support. Defendant's pro se argument alleges the State failed to prove penetration; and, therefore, his conviction should be overturned.

> The analysis for insufficient-evidence claims is well settled:
>
> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact

finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Second degree rape pursuant to La.R.S. 14:42.1 provides:

A. Second degree rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:

(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

A conviction for second degree rape requires the State to prove: "(1) . . . sexual intercourse regardless of degree of penetration; (2) lack of consent of the victim; (3) a victim who was prevented from resisting by force or threat of physical violence; and (4) a victim who reasonably believed that resistance would not prevent the rape." *State v. Wallace*, 00-1745, p. 9 (La.App. 5 Cir. 5/16/01), 788 So.2d 578, 584, *writ denied*, 01-1849 (La. 5/24/02), 816 So.2d 297. Although the quote from *Wallace* actually states "anal or vaginal sexual intercourse," we note this is because La.R.S. 14:42.1(A) was amended after *Wallace* to include oral rape along with anal and vaginal rape.[1] *Id.*

Defendant's convictions and sentences for second degree rape arose following the testimony and evidence presented at trial and in the record on review. The State's first witness at trial was Sergeant Mike Dunn of the Vermilion Parish Sheriff's Office. Sergeant Dunn testified that on July 26, 2017, he proceeded to a

---

[1] *See* 2001 La. Acts No. 301, § 1.

Lafayette Parish hospital to interview a victim regarding a crime that occurred in Maurice, Louisiana. He revealed that at the hospital, he met Defendant's wife, Stacey Disedare, who had severe facial bruising and lacerations. She told Sergeant Dunn that Defendant, "her estranged husband," had attacked her when she exited her vehicle by punching her, knocking her down, and choking her unconscious. Sergeant Dunn recalled that as Mrs. Disedare described the nearly thirteen-hour ordeal, she was still piecing together memories while sitting in the emergency room. According to Sergeant Dunn, Mrs. Disedare stated she woke up with Defendant slapping her before he helped her into the house, pushed her into a chair, and demanded she perform oral sex. Mrs. Disedare told Sergeant Dunn she performed the oral sex because she did not want to anger Defendant and suffer another beating. She remembered Defendant having a knife at some point and recalled Defendant telling her he had burned her clothing. Sergeant Dunn testified that he found a burn pile at the same location described by Mrs. Disedare and noted dead grass had been thrown over the area in an attempt to conceal the burnt ground. Sergeant Dunn testified that he smelled burnt clothing and found burnt clothing in a nearby little trailer. He described the little trailer as one "that you could use to pull behind your lawnmower." When asked if the burn spot was recent, Sergeant Dunn replied that "you could smell that it was fresh."

According to Sergeant Dunn, Mrs. Disedare revealed that during the thirteen-hour ordeal, Defendant let her to take a shower after which she put on pajamas and got into her bed. She told Sergeant Dunn that Defendant, who was naked, climbed into the bed with her, took off her pajama bottoms, and penetrated her three times. Mrs. Disedare told Sergeant Dunn that during the night, Defendant gave her pills which she ingested. According to his testimony, Mrs. Disedare stated that she had thrown up blood. He explained that around 10:00 or

8

10:30 the next morning, Mrs. Disedare convinced Defendant to return her keys and phone, and she called an ambulance. Sergeant Dunn noted that Mrs. Disedare advised that the sexual interactions were not consensual; however, she failed to resist because she did not want to sustain additional beatings. The State then walked through a number of photographs which were entered into evidence, including photographs of Mrs. Disedare's face which revealed that both of her eyes were swollen and virtually shut.

Sergeant Dunn explained that he and another deputy went to Mrs. Disedare's residence after obtaining arrest warrants for Defendant. Sergeant Dunn testified that during their interaction with Defendant at the residence, he admitted to beating Mrs. Disedare. Sergeant Dunn noted that they did not find the knife Mrs. Disedare claimed Defendant used although they did not initially search the house; instead, they arrested Defendant and transported him. Sergeant Dunn subsequently obtained a warrant for Defendant's DNA, which was retrieved from Defendant by Sergeant Kim Verret.

On cross-examination, Sergeant Dunn acknowledged that he was confident clothes belonging to a woman were burned "because of the thickness of the material," although he could not verify to whom the clothes belonged. He confirmed that Mrs. Disedare stated Defendant was armed with a knife but was unsure as to exactly when he had the knife, and she did not allege Defendant used the knife on her. Sergeant Dunn testified that a rape kit was conducted on Mrs. Disedare during the three hours he was with her at the hospital. He confirmed Mrs. Disedare told him she never told Defendant "no" or to "stop" with regard to the sexual assaults because she was afraid Defendant would beat her again.

The State then called the victim, Mrs. Disedare, who acknowledged a 2002 felony conviction for theft of food stamps. She stated that on July 25, 2017, she

was at a friend's house. When Mrs. Disedare subsequently returned home before 10:00 p.m., she saw one of her vehicles had been moved and the light was illuminated inside her shed. She testified that she exited her car and before she could open the back door to let her dog out, Defendant "appeared out of the dark and started pushing" her. Mrs. Disedare explained that she and Defendant had been separated since February 2017. She revealed they had lived together as roommates, not sharing a bedroom, at one point while trying to fix their marriage. Mrs. Disedare testified she told Defendant he should not be at her house because she thought there was a restraining order; the restraining order had actually expired at the time. She stated that Defendant pushed her away from her vehicle until she fell, at which time she struggled to escape until he wrestled her down from behind and began choking her. Mrs. Disedare revealed that Defendant hit her in the face before she fell and choked her until she was unconscious. She recalled waking up to Defendant hitting her in the face but was unsure how long she was unconscious.

Mrs. Disedare testified that after waking up to Defendant hitting her, he pushed her towards the house and forced her to hurry inside. She recalled that during this time, she could barely see and was having trouble standing. Upon entering the house, Mrs. Disedare noticed Defendant had ransacked the home. She testified that Defendant was "ranting and raving about this and that, just -- and while he was ranting and raving, he was just [] swinging back and forth on me." According to her testimony, she was trying to figure out how to escape and revealed that during the initial attack, Defendant took her keys and threw them into the yard. Mrs. Disedare revealed that Defendant took her phone. She testified that her face was swollen, her eyes were swollen shut, and Defendant continued to beat her while she was in a recliner that Defendant had shoved her into.

Mrs. Disedare testified that during the course of Defendant's ranting and raving, he unzipped his pants, "pull[ed] himself out," and told her "to suck it." She testified that she complied with Defendant's request although he subsequently became frustrated when he was unable to get an erection and stopped her. Mrs. Disedare was adamant that she did not consent to the oral sex, stating that she feared Defendant. She testified that around that time, Defendant had a knife and threatened to kill her. Although she could not describe the knife because her eyes were swollen, she recalled seeing "a glimmer of a blade" and felt the point of the knife poke her in the chest. Mrs. Disedare testified that she continuously begged Defendant to stop although he continued beating her. She recalled having trouble breathing because she was coughing up blood and had blood coming from her nose.

Mrs. Disedare revealed that Defendant started berating her and instructed her to clean up the messy house, only to continue shoving her and hitting her when she was not moving quickly enough. According to her testimony, she ended up on the sofa where she attempted to shield her head while Defendant was striking her. Mrs. Disedare explained that she was trying to figure out how to escape but was unable to because Defendant would not let her near the door, would not leave her unattended, and she believed he still had a knife in his back pocket.

Mrs. Disedare testified that at daybreak, Defendant told her to clean up in the shower. She revealed that during her shower, Defendant entered the bathroom several times and was annoyed because of how long she was taking. After her shower, Mrs. Disedare put on pajamas, got into bed, and pretended to be asleep in the hopes Defendant would not beat her again. She stated that Defendant brought her pills and told her it would help with her pain. According to her testimony, at this point, Defendant told her he would take care of her.

Mrs. Disedare testified that after Defendant gave her medication, he got into bed naked where he took her pants off, spread her legs, and "tried to penetrate" her. She explained that Defendant penetrated her a few times but "couldn't get a full erection and he got frustrated and got out of bed." According to Mrs. Disedare, Defendant did not ejaculate during either sexual assault. Mrs. Disedare testified that she was afraid she was going to lose her eyesight from the beating and begged Defendant to let her call an ambulance, convincing him she would lie and say she fell and could not drive herself to the hospital. According to her testimony, Mrs. Disedare suggested Defendant hide and noted he sat in the room while she called the ambulance after he returned her phone. Mrs. Disedare testified Defendant had to dial 9-1-1 because she could not see her phone, and she was unsure what time the call occurred.

Mrs. Disedare testified that she threw up blood in the ambulance on the way to the hospital. Upon arrival, the doctors explained that her injuries were not the result of a fall, at which point she told them Defendant had beaten her. She told them Defendant had "forced himself" upon her, and they called law enforcement. Mrs. Disedare testified that a nurse did a rape kit on her. Acknowledging the hospital performed a toxicology screen and found opiates and cocaine in her system, Mrs. Disedare testified that she had a prescription for opiates, namely Percocet, and had no idea why she tested positive for cocaine. She testified she was at the hospital for hours and was not discharged until after dark.

Mrs. Disedare testified that she returned home the following day after being informed Defendant had been arrested. She stated Defendant had told her while beating her that he had "burned a bunch of [her] clothes and stuff as well." Over the following days and weeks, Mrs. Disedare testified that she noticed several articles of clothing were missing. She revealed that she found the clothes she and

Defendant wore on July 25 in the dryer and assumed Defendant had washed them. She testified that numerous hats and caps were missing, along with sports shirts and memorabilia clothing. She stated that "family paperwork dating back to the 1700s" was missing and estimated around $2,000 worth of property was gone. Mrs. Disedare noted that she suffered a "[b]roken nose, bruised face, bruised arm, shoulder, [and] bruised neck."

On cross-examination, Mrs. Disedare acknowledged that she could not be sure what the red material in the burn remains was. She acknowledged that at the time of the attack, Defendant had a restraining order against her. She acknowledged that she previously attempted to get a restraining order against Defendant extended in March 2017, which was denied on March 28, 2017 after a hearing, with the reason being a failure to prove facts. Mrs. Disedare admitted that her request for a restraining order was denied for the same reason on May 9, 2017, after a hearing before a different judge. She acknowledged speaking to Defendant a few days before the attack but stated she had not seen him since the court proceedings in May 2017. Mrs. Disedare testified that she was not conscious the entire time because Defendant choked her unconscious more than once. Confronted with medical reports indicating she denied loss of consciousness, Mrs. Disedare testified she had denied losing consciousness during the ambulance ride.

The State called Desiree Breaux, an emergency room nurse at Lafayette General Medical Center. She testified that she was present when Mrs. Disedare related the events to Sergeant Dunn, stating the victim alleged having been sexually assaulted. Noting that she was not a SANE nurse, Ms. Breaux testified that she had performed over a hundred sexual assault exams when she worked at Charity Hospital in New Orleans, and she testified she performed one on Mrs. Disedare. According to Ms. Breaux, she noted Mrs. Disedare had abrasions to her

13

forehead, both eyes were swollen and bruised, her nose was red and swollen, her lips were bruised, and there were scratches on her neck. She recalled that Mrs. Disedare had abrasions to her back and contusions to her arm.

Ms. Breaux recounted her notes of what Mrs. Disedare told Sergeant Dunn. Mrs. Disedare stated Defendant approached her and began slapping and punching her and choked her until she passed out. When Mrs. Disedare attempted to get her dog out, Defendant again pushed her and slapped her until she fell. Ms. Breaux noted "[i]t didn't sound like she lost consciousness at that time." Mrs. Disedare stated Defendant was choking her while threatening to kill her. When Mrs. Disedare awoke to Defendant slapping her, she entered the house which was damaged and recalled that Defendant had "burned her clothes." Mrs. Disedare stated Defendant continued to punch and slap her while she was in a recliner before he ordered her to clean the home and take a shower. She indicated Defendant became nicer "due to the fear of her injuries." Eventually, Defendant allowed Mrs. Disedare to call an ambulance and hid when they arrived. Mrs. Disedare stated that after her shower, Defendant climbed into bed and penetrated her three times without her consent and without a fight due to the trauma already inflicted.

The State called Jeremy Dubois of the Acadiana Crime Lab, whom the parties stipulated was an expert in forensic biology. Mr. Dubois testified that he performed an initial screening on the sexual assault kit for blood and seminal fluid. He performed DNA testing of the external genital swabs and screened the victim's clothing. Mr. Dubois testified there was blood on both fingernail swabs, the vaginal swabs, the external genital swab, as well as on the victim's shirt and pants. He testified there was no seminal fluid detected on the vaginal, oral, or external genital swabs or the clothing. Mr. Dubois explained there were mixed DNA

14

profiles located on the swabs taken from the waistband and crotch regions of Mrs. Disedare's pants. He revealed that there was a partial male profile on the external genitals although it was too incomplete to make a positive identification. With regard to the waistband of Mrs. Disedare's pants, Mr. Dubois testified that there was a mixed DNA profile which included at least three males, and Defendant could not be excluded as a contributor. He testified that approximately 99.991 percent of the male population could be excluded although Defendant was in the 0.009 percent that could not be excluded. Mr. Dubois noted there was a mixed profile containing at least two males on the crotch of the pants, and Defendant could not be excluded as a contributor.

The State called Acadiana Crime Lab's Bethany Harris, who was accepted as an expert in forensic biology. Ms. Harris explained that a true allele test is a more detailed, computer-aided testing technique than STR or Y-STR testing. She noted that true allele testing, like STR testing, tests both male and female alleles, unlike Y-STR testing which only tests male alleles. Ms. Harris revealed that Defendant could not be excluded as a contributor to the mixed profiles on Mrs. Disedare's waistband or crotch. Ms. Harris noted no true allele testing was done on the external genital swabs because the profile produced "was single source and matched" to the victim. The State rested its case, and the defense chose not to call any witnesses.

On appeal, Defendant contends the State failed to prove the third element of the offense, that Mrs. Disedare was prevented from resisting by force or threat of physical force. As noted above, Defendant relies on *Powell*, wherein this court overturned a conviction for violating La.R.S. 14:42.1 because "the evidence is insufficient to convince a reasonable fact finder beyond a reasonable doubt that the victim was prevented from resisting the act by threats of force or physical violence

15

under the circumstances." *Powell*, 438 So.2d at 1308. We find *Powell* is distinguishable from the instant matter based upon a paragraph of this court's ruling which Defendant omitted from his nearly full-page quotation:

> Even if we were to give conclusive weight to the victim's testimony in the trial, the State has still failed to present evidence to prove an essential element of the crime. This is evidenced by the trial court's doubt in his reasons as stated above. Certainly, the victim was afraid, but she also testified that the defendant said he would not hurt her. It is important to note that all of the witnesses who saw the victim immediately after the alleged rape testified that they did not see any cuts, bruises or evidence of any physical attack. Her own testimony indicates that she did not make any efforts to resist. The victim asserted at trial that the defendant threatened to kill her, yet, he did nothing to warrant a reasonable person in these circumstances to believe that resistance would not prevent the rape. The victim testified that she took her own pants off while defendant disrobed. She admitted that she never saw the object under the seat which defendant allegedly threatened to kill her with.

*Id.*

In this case, testimony revealed that the victim was afraid. The testimony revealed Defendant had beaten and choked the victim unconscious outside, forced her into the house, beat her again before taking off his pants and demanding oral sex, and beat her again after the act. Although Mrs. Disedare testified that she did not resist but attempted to perform oral sex before Defendant got frustrated and zipped his pants up when he could not get an erection, she also testified the sex was not consensual and performed out of fear that Defendant would continue beating her if she refused. Mrs. Disedare's testimony also revealed that although she attempted to perform oral sex, Defendant continued to physically abuse her afterward when she was unable to clean up the house fast enough due to the injuries she previously sustained from Defendant.

As noted by the second circuit in *State v. Ponsell*, 33,543, p. 5 (La.App. 2 Cir. 8/23/00), 766 So.2d 678, 682, *writ denied*, 00-2726 (La. 10/12/01), 799 So.2d 490:

16

The testimony of the victim alone was sufficient to convict the defendant. As noted previously, in the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Ford*, 28,724 (La.App.2d Cir.10/30/96), 682 So.2d 847, *writ denied*[,] 99-0210 (La.5/14/99), 745 So.2d 12. This is equally applicable to the testimony of sexual assault victims. *State v. Rives*, 407 So.2d 1195 (La.1981); *State v. Thomas*, 30,490 (La.App.2d Cir.4/8/98), 711 So.2d 808, *writ denied*, 99-0331 (La.7/2/99), 747 So.2d 8; *State v. Free*, 26,267 (La.App.2d Cir.9/21/94), 643 So.2d 767, *writ denied*, 94-2846 (La.3/10/95), 650 So.2d 1175; *State v. Standifer*, 513 So.2d 481 (La.App. 2d Cir.1987). Indeed, such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant.

Accordingly, Mrs. Disedare's testimony alone was sufficient to prove that she was prevented from resisting by force and that she reasonably believed resistance would be futile. This part of Defendant's sufficiency claim lacks merit.

With regard to Defendant's claim that the State failed to prove penetration, we note Mrs. Disedare's testimony that she was performing oral sex when Defendant got frustrated and stopped her. Any penetration is sufficient for second degree rape, and the act of putting his penis inside Mrs. Disedare's mouth satisfied the penetration requirement with regard to oral sex. This argument lacks merit.

Both assignments of error contend the trial court erred in accepting Mrs. Disedare's testimony, with Defendant's pro se argument specifically arguing it was wrong for the court to find Mrs. Disedare's testimony consistent with regard to the oral rape but inconsistent regarding the vaginal rape. As noted by the fifth circuit in *State v. Moore*, 16-644, p. 11 (La.App. 5 Cir. 3/15/17), 215 So.3d 951, 961, "[w]hen the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness." The trial court, acting as trier of fact, could have believed Mrs. Disedare's testimony regarding the oral rape, which remained consistent from initial reporting until trial, while disbelieving the vaginal

17

rape testimony, which changed from Defendant tried to penetrate her to he did penetrate her. This is especially true as the DNA experts testified there was not enough male DNA present on the genital swabs taken from Mrs. Disedare to create a profile. The trial court, sitting as trier of fact, heard this testimony and found Defendant guilty. Viewing the evidence in a light most favorable to the prosecution, we cannot say the State failed to prove its case. This argument lacks merit.

Finally, regarding the issue of failure to test for DNA on the oral swabs taken from Mrs. Disedare, we will address this issue along with Defendant's first pro se assignment of error, which contends the State violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), by failing to test said swabs.

## IV.    Assignment of Error No. 3

In his third assignment of error, Defendant contends there was insufficient evidence to support his conviction for second degree battery. Defendant suggests there was no evidence Mrs. Disedare suffered extreme physical pain or that Defendant inflicted serious bodily injury.

> A "[b]attery is the intentional use of force or violence upon the person of another; or the intentional administration of a poison or other noxious liquid or substance to another." La.R.S. 14:33. Second degree battery is defined in La.R.S. 14:34.1(A) as "a battery when the offender intentionally inflicts serious bodily injury[.]" Pursuant to La.R.S. 14:34.1(B), serious bodily injury "involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death." As noted by this court in *State v. Robinson*, 549 So.2d 1282, 1284-85 (La.App. 3 Cir.1989):
>
> > To convict a person of second-degree battery, the State must prove the following elements beyond a reasonable doubt: (1) the intentional use of force or violence upon the person of another; (2) without the consent of the victim; and, (3) when the offender has specific intent to inflict serious bodily injury. *State v. Fuller*, 414 So.2d 306 (La.1982). Specific criminal

18

> intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10(1). Moreover, specific intent is a state of mind which need not be proven as a fact, but may be inferred from the circumstances of the transaction and actions of the defendant. *State v. Fuller, supra*.

*State v. Francisco*, 10-881, pp. 2-3 (La.App. 3 Cir. 2/2/11), 55 So.3d 995, 997 (alteration in original). Although the specific portion of La.R.S. 14:34.1(B) which was referenced in the quote has since been repealed, La.R.S. 14:2(C) states, "[f]or purposes of this Title, 'serious bodily injury' means bodily injury which involves unconsciousness; extreme physical pain; protracted and obvious disfigurement; protracted loss or impairment of the function of a bodily member, organ, or mental faculty; or a substantial risk of death."

We find Mrs. Disedare's testimony that she lost consciousness multiple times throughout the course of the thirteen hours between her arriving home and being allowed to call an ambulance is sufficient to support the conviction. Although Defendant attacks this testimony due to Ms. Breaux's notes "that it did not sound like Mrs. Disedare lost consciousness at that time," this is a mischaracterization of Ms. Breaux's testimony. While testifying, Ms. Breaux specifically noted it did not sound like the victim lost consciousness during the time between Defendant slapping her awake and pushing her into the house. Furthermore, while Defendant contends there was no broken nose as reported by Mrs. Disedare, her medical records include the following evaluation: "No acute intracranial hemorrhage. Hematoma overlies the left orbit. Likely acute fracture [to] the anterior superior nasal bones which are relatively nondisplaced." Mrs. Disedare's nose may not have been broken, but it was fractured. Thus, there is

sufficient evidence to indicate she suffered serious bodily injury as defined by La.R.S. 14:2(C). This assignment of error lacks merit

## V. Assignment of Error No. 4

In his fourth assignment of error, Defendant contends the trial court erred in finding sufficient evidence to convict him of false imprisonment while armed with a dangerous weapon. Defendant insists it is questionable whether a dangerous weapon was present since Mrs. Disedare admitted she never attempted to leave. In support, Defendant relies upon *State v. Touchet*, 04-1027, p. 11 (La.App. 3 Cir. 3/9/05), 897 So.2d 900, 908, wherein this court stated:

> In order for this court to uphold a conviction of false imprisonment while armed with a dangerous weapon, La.R.S. 14:46.1 requires the State prove that the Defendant unlawfully and intentionally confined or detained the victim while armed with a dangerous weapon.
>
> Although the record established that the victim was intimidated by the Defendant, and that he insisted on accompanying her when they left the house, the record reflects no evidence whatsoever that the victim attempted to leave the home and was prevented from doing so by the Defendant.
>
> Accordingly, we vacate the Defendant's conviction for false [i]mprisonment while armed with a dangerous weapon.

As noted by the State in response, Mrs. Disedare testified that upon first contact with Defendant, he dispossessed her of her cell phone and keys and threw them in the yard before attacking her. Mrs. Disedare testified that she begged Defendant on numerous occasions to let her leave or call an ambulance. Although she could not describe the knife in detail because her eyes were swollen shut from Defendant beating her, Mrs. Disedare testified she saw the metal of the knife, believed Defendant was keeping it in his back pocket, and testified he put it to her neck and chest and threatened to cut her heart out. Throughout her testimony, Mrs. Disedare noted she could not outrun Defendant because she previously had

20

undergone hip replacement surgery. She testified on numerous occasions that she could barely see because her eyes were swollen, a fact verified by her medical records and photographs.

Although Defendant contends it is questionable whether a knife was present, Mrs. Disedare told Sergeant Dunn in her initial report that Defendant had threatened her with a knife. At trial, she testified that she could feel the knife and believed it was in Defendant's back pocket. Ms. Breaux confirmed that Mrs. Disedare told Sergeant Dunn Defendant had a knife, remembering the same language about cutting out Mrs. Disedare's heart. The trial court, sitting as trier of fact, heard this testimony and found Defendant guilty, evidencing a belief that Defendant had been armed with a knife. Viewing the evidence in a light most favorable to the prosecution, we cannot say the State failed to prove its case. Accordingly, this assignment of error lacks merit.

## VI.    Assignment of Error No. 5

In his fifth assignment of error, Defendant contends there was insufficient evidence to support his conviction of simple arson. Simple arson is defined by La.R.S. 14:52(A)(1) as "[t]he intentional damaging by any explosive substance or the setting fire to any property of another, without the consent of the owner and except as provided in R.S. 14:51." Mrs. Disedare testified Defendant told her he had burned her property while he was beating her and that upon returning home, she found around $2,000 worth of sports memorabilia, clothing, and family records missing. Sergeant Dunn noted they found a burnt patch of grass upon first approaching the house, which smelled fresh and smelled like burnt clothing. Sergeant Dunn found ashes and burnt red cloth in a small trailer near the burn area, which he stated had dead grass thrown over it in an attempt to disguise it.

Defendant's sufficiency argument is that because neither Sergeant Dunn nor Mrs. Disedare could identify exactly what article of her clothing was the burnt red cloth, the State could not prove beyond a reasonable doubt that Defendant had not simply been lying to Mrs. Disedare or that he had not burned his own clothing. We find this assignment of error's viability hinges upon the trial court's decision to believe Mrs. Disedare's statement that Defendant confessed to burning her clothing. Under La.R.S. 15:449, a confession is "an admission of guilt." As this court noted in *State v. Richardson*, 16-107, p. 27 (La.App. 3 Cir. 12/28/16), 210 So.3d 340, 358, "a confession is considered direct evidence[.]" Were it not for Defendant's confession to Mrs. Disedare, the State would have had to exclude every reasonable hypothesis of innocence under the circumstantial evidence rule set forth in La.R.S. 15:438, including the insinuation at trial that Defendant may have burned his own clothing.

We find that the circumstantial evidence rule does not apply because Defendant's conviction rested upon both direct and circumstantial evidence. Given the trier of fact's authority to make credibility determinations, we cannot say there was insufficient evidence when viewing the evidence in a light most favorable to the prosecution. Accordingly, this assignment of error lacks merit.

**VII. Pro Se Assignment of Error No. 1**

In his first pro se assignment of error, Defendant contends the State's failure to conduct DNA extraction or a Y-STR DNA analysis on the oral swabs taken from Mrs. Disedare was a violation of *Brady* and *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555 (1995). Defendant alleges that the State's failure to conduct such testing undermines confidence in the outcome of the trial. We find that this assignment of error lacks merit.

22

Mrs. Disedare's testimony was that Defendant could not get an erection when she performed oral sex on him and accordingly did not ejaculate. As such, there would have been no seminal fluid present. Indeed, Mr. Dubois specifically testified no spermatozoa were found on the oral swabs or slides. To the extent there may have been contact DNA in the victim's mouth from Defendant's penis, the victim testified she vomited multiple times prior to arriving at the hospital.

Additionally, the United States Supreme Court has previously stated there are three components of a true *Brady* violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948 (1999). We note there was no suppression of evidence in this case. Although the State did not conduct the testing Defendant contends could have proven his innocence, Defendant was aware of the DNA testing prior to trial as the minutes indicate that on November 7, 2018, the trial court ordered additional DNA testing at Defendant's request and over the State's objection. It is clear that the State provided Defendant with the results of DNA testing performed and did not suppress anything. As such, Defendant's complaint regarding DNA testing is not actually a *Brady* claim under the components set out by *Strickler*.

Finally, Defendant's argument includes citations to La.Code Crim.P. arts. 924, 926.1, and 930.3. We note that all three of these articles are related to post-conviction relief applications. Additionally, it is unclear how Defendant believes DNA testing of the oral swabs taken from the victim would prove his factual innocence since there was no claim he ejaculated and the victim vomited multiple times prior to the swabs being taken. Even if this court would consider

23

Defendant's claim under the rules of post-conviction relief, La.Code Crim.P. art. 926.1(B)(1) requires that DNA testing be able to "establish the innocence of the petitioner." As noted, DNA testing of the oral swabs from the victim would not actually prove Defendant innocent. This pro se assignment of error lacks merit.

## VIII. Pro Se Assignment of Error No. 2

In his second pro se assignment of error, Defendant contends the trial court erred in failing to rule upon his motion to quash. We note that a Motion to Quash was filed by trial counsel on October 11, 2018, and scheduled for a contradictory hearing on October 25, 2018. The motion was continued at that time until the scheduled November 16, 2018 trial date, which was itself continued and ultimately never ruled upon. As suggested by Defendant, La.Code Crim.P. art. 537 requires that a motion to quash "shall be tried by the court without a jury." However, this court has previously noted that "when a defendant proceeds to trial without objecting to the trial court's failure to rule on a pending motion, he waives any further objections to the trial court's failure to dispose of that motion." *State v. Thibodeaux*, 14-1002, p. 9 (La.App. 3 Cir. 3/11/15), 162 So.3d 665, 671.

Defendant's bench trial began on April 17, 2019. Prior to the commencement of trial, the trial court had Defendant verbally acknowledge that he understood he was waiving his right to a jury trial and opting to be tried before a judge. The trial court then immediately asked if the parties were ready, both the State and defense counsel agreed they were, and the trial began. At no time was any objection raised to the trial court's failure to rule upon the motion to quash filed on October 11, 2018. Furthermore, Defendant fails to assert that any objection was ever raised. Accordingly, we find Defendant waived his right to raise this assignment of error when he proceeded to trial without objection. This pro se assignment of error lacks merit.

24

## IX.    Pro Se Assignment of Error No. 3

In his third pro se assignment of error, Defendant contends his sentence is invalid under La.Code Crim.P. art 872, which requires that a valid sentence must rest upon a valid and sufficient statute, indictment, and judgment of guilty. Defendant argues both that the indictment, in this case a bill of information, was defective and that the trial court's judgment was invalid. For the following reasons, this assignment of error lacks merit.

Defendant contends the bill of information fails to conform to the requirements of Chapters 1 and 2 of Title XIII. Defendant opines that the trial court acknowledged there seemed to be an issue with probable cause but would not make a finding as to probable cause. As the second circuit noted in *State v. Robinson*, 47,427, p. 8 (La.App. 2 Cir. 10/3/12), 105 So.3d 751, 756, "[a] bill of information must set forth an identifiable offense and inform defendant of the statutory basis of the offense, but need not set out detailed facts constituting violation since those facts can be given to defendant by answers to a bill of particulars." We note that in the amended bill of information filed on October 25, 2017, all seven counts against Defendant specifically identify the offense by statute number, the dates of the offenses, and the victim of the offenses. Accordingly, this portion of Defendant's assignment of error lacks merit.

Regarding Defendant's claim that the trial court recognized an issue with probable cause during the Gwen's Law hearing, we note initially that the Gwen's Law hearing does not determine probable cause to charge a defendant, but rather the specifics of bail in a case involving certain crimes, particularly those involving domestic violence. *See* La.Code Crim.P. art. 313(A)(2). The issue of probable cause is irrelevant at a Gwen's Law hearing. Additionally, as the trial court noted, probable cause on the offenses listed in the arrest warrant at the time of the Gwen's

Law hearing had already been decided when the arrest warrant was issued. Moreover, the Gwen's Law hearing occurred on July 31, 2017, nearly three months before the amended bill of information was filed. It has no bearing on the validity of the bill of information, and this argument lacks merit.

Defendant further contends the trial court's judgment was invalid because it found Defendant guilty of oral forcible rape based upon the consistency of the victim's testimony regarding said sexual assault but also found him innocent of vaginal forcible rape due to the inconsistent testimony of the victim. As discussed above, there was physical evidence that at least raised reasonable doubt as to the victim's testimony regarding the vaginal rape allegation, namely the fact that she testified Defendant used his saliva as lubricant before penetrating her three times; however, there was insufficient DNA to obtain a male profile. The victim's testimony regarding the oral rape, however, was largely consistent with the information she provided to Sergeant Dunn during their initial encounter at the hospital. As such, the trial court was within its great discretion as the finder of fact to believe part of Mrs. Disedare's testimony but not all of it. Therefore, this pro se assignment of error lacks merit because Defendant's sentence is valid under La.Code Crim.P. art. 872.

## X. Pro Se Assignment of Error No. 5

In his fifth pro se assignment of error, Defendant contends the victim's testimony against him constitutes either perjury, in violation of La.R.S. 14:124, or false swearing, in violation of La.R.S. 14:125. Defendant asserts that all of the victim's testimony should be ignored and deemed not credible because she gave her original statements to Sergeant Dunn and Ms. Breaux while under the influence of cocaine and opioids when she claimed she had not used cocaine and had a prescription for opioids but did not present said prescription at trial.

26

We find this argument is asking this court to dismiss the trial court's determination that at least some of Mrs. Disedare's testimony was credible and to acquit Defendant because the evidence that convicted him was said testimony. As noted in *Kennerson*, 695 So.2d at 1371, "[i]t is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review." As discussed above, we cannot suggest this court invade the trier of fact's great discretion to determine witness credibility. To the extent Defendant argues his wife should be prosecuted for violating either La.R.S. 14:124 or 14:125, that is a decision solely within the purview of the District Attorney's Office.

## DISPOSITION

For the reasons assigned above, the convictions and sentences of Clyde Santon Disedare, Jr., are affirmed.

**AFFIRMED.**